Filed 1/28/21  P. v. Perez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B296242 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA113936) |
| v. | |
| ERIK ARMENTA PEREZ and OMAR VALENZUELA PEREZ, | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Judgments affirmed.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant Erik Armenta Perez.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant Omar Valenzuela Perez.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Noah P. Hill and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

---

Defendants and appellants Omar Valenzuela Perez (Omar) and Erik Armenta Perez (Erik)[1] appeal their convictions for first degree murder.  Appellants contend:  the evidence was insufficient to support the verdicts; the trial court committed instructional and evidentiary errors, and abused its discretion by refusing the defense request for a mid-trial continuance; the prosecutor committed misconduct during closing argument; and the cumulative effect of the purported errors was prejudicial.  Discerning no reversible error, we affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Background information*

Appellant Omar is appellant Erik's uncle, and is three years older than Erik.  Approximately a month and a half before the charged murder, Erik moved to California from Arizona and began staying in Omar's home.  Prior to that time, the men had met only twice.

The victim, Alberto Calvillo, and Karen Salinas were engaged to be married and had two young children together.

2. *People's evidence*

a. *The murder*

On the evening of November 6, 2016, Calvillo and Salinas, accompanied by Salinas's cousin Ernesto and her friend Lizeth, went to the Mariscos Uruapan restaurant in Baldwin Park

---

[1]    Because appellants share the same last name, for the sake of convenience, and with no disrespect, we hereinafter refer to them by their first names.

2

(hereinafter "Mariscos"). In addition to serving food, Mariscos offered live music. Mariscos was equipped with a video surveillance system, with cameras both inside and outside of the restaurant.

Erik and Omar also patronized Mariscos that evening, and sat at a table near Calvillo's group. Juan Serrano, another restaurant patron, spent approximately a half hour drinking, dancing, and eating at appellants' table after his original dining companions left for the evening. He had not met either appellant previously. Erik and Omar had no confrontation or issue with Calvillo while inside the restaurant.

Shortly before 11:00 p.m., Salinas began feeling unwell. She and Calvillo stepped outside so she could get some fresh air. In front of the restaurant's entrance was a small, tiled area. A ramp led down from the entrance to the parking lot. Perpendicular to the ramp, some stairs led out to Ramona Boulevard. Calvillo and Salinas stood on the stairs, with Calvillo a step from the top.

As Calvillo and Salinas talked on the stairs, Erik, Omar, and Serrano came outside and stood near them at the top of the ramp. Omar loudly made derogatory remarks about women, including that all women were "gold diggers" and "whores" who only wanted money. He appeared angry and agitated. Calvillo told the men several times, "Shut up. You guys are drunk." Someone from Omar's group said that they were not talking about Salinas. But, one of the men then pointed at Salinas, and one of them said, "Well, look at your girl. Look at what she's wearing." Omar said to Erik several times, "Go get the 9." Erik left the group and went to the parking lot.

3

Calvillo stepped up to the top of the ramp where Omar and Serrano were, approximately three feet away from them. Serrano tried to calm Omar down. Salinas stepped in front of Calvillo and tried to convince him to go inside. He refused, saying he was not going to fight and was not going to start anything, but was not going to "go inside and look like a bitch," either. He told Salinas to go back in the restaurant and get her cousin Ernesto. She did.

Meanwhile, Erik walked through the parking lot, entered a Toyota Camry, and drove it to the driveway in front of the restaurant. He left the engine running, and remained in the car. When the Camry pulled up, Omar ran down the ramp to the car. Erik opened the door and handed Omar a gun. Omar then ran back up the ramp to the front of the restaurant, shot Calvillo multiple times, ran back down the ramp to the Camry, and entered the front passenger seat. Erik drove them from the scene.

Salinas heard screaming and went back outside, where she found Calvillo on the ground, having difficulty breathing. Her friend Lizeth attempted to put pressure on Calvillo's gunshot wounds, while Salinas held Calvillo's hands. Calvillo was transported to a hospital, but did not survive.

The entire incident, from when appellants came outside until the shooting, lasted just over three minutes.

b. *The investigation*

Police officers stopped the Camry within 15 minutes of the murder. In a field show-up, Salinas identified both appellants, who were arrested.

Police found 9 nine-millimeter Aguila casings at the scene. Three additional nine-millimeter casings were found in the

4

Camry.[2]  A Browning Arms, high-powered, nine-millimeter semiautomatic handgun was found hidden in the center console beneath the gearshift.  A firearms examiner opined that the gun in the Camry discharged all the casings found at the murder scene and inside the car, as well as three bullet fragments recovered from Calvillo's body.  Gunshot residue was found on both appellants' hands.  Erik's DNA was found on the gun's grip, as well as on the three casings found in the Camry.

After appellants' arrests, Erik was seated in a police car for 10 to 15 minutes.  On the floor in front of Erik's seat, officers found four small baggies containing  methamphetamine.  A detective opined that the methamphetamine was possessed for the purpose of sale, but acknowledged that "users also sell." Omar had in his possession two baggies containing cocaine.

Calvillo suffered five gunshot wounds to his shoulder, left chest, abdomen, and right leg.  The shoulder and chest wounds were fatal.  His toxicology report tested negative for alcohol but positive for methamphetamine and its metabolite.

3. *Defense evidence*

a. *Erik's testimony*

Erik testified in his own behalf, as follows.  On the day of the shooting, at 3:00 p.m., he and Omar consumed approximately a half bottle of tequila while at home.  At about 4:00 p.m., they went to Ramada, a "dance place" in Baldwin Park, to drink and celebrate the impending birth of his child.  Erik drove them there.  At Ramada, the men drank beer and used "a lot" of

---

[2]     Erik testified that earlier on the day of the shooting, Omar had fired the gun several times while in the Camry.  The casings found in the car were a result of that shooting.

5

cocaine in the restroom; they also ingested methamphetamine. They met two women, Guadalupe M. and her friend, whom they had never met before.  The women declined their requests to dance because the music was not good.  The men suggested the women accompany them to a different restaurant, but they refused and said they were going to Mariscos.  When the women left, Erik and Omar also went to Mariscos.

At Mariscos, Guadalupe and her friend sat at Omar and Erik's table.  Erik flirted and danced with Guadalupe, while Omar directed his attentions to the friend.  Erik and Omar bought the women drinks, and Omar bought them flowers.  At some point thereafter, the women left the restaurant.  Erik walked with them to their car, unsuccessfully trying to persuade them to stay.

While at Mariscos, Omar and Erik ordered several buckets of beer.  Omar ingested cocaine at the table.  Erik also used cocaine, but in the restroom.  The men also used methamphetamine.  They had no "problems" with anyone while inside the restaurant.

Around 11:00 p.m., Omar, Erik, and Serrano walked outside and stood at the top of the ramp, near Calvillo and Salinas.  Omar was upset that Guadalupe and her friend had left. Referring to the women, Omar loudly talked about women being "completely worthless" and only caring about money.  Calvillo got upset because he believed Omar was talking about Salinas.  He began arguing with Omar.  Omar apologized and stated he was not referring to Salinas.  Calvillo, who was a big man and looked angry, stepped toward them, stood over Erik, and threatened to "beat the fuckin' shit out of" them.  Erik thought Calvillo wanted to hit them and fight, and was afraid.  Salinas tried to separate

6

Calvillo from the men and convince him to go inside, but he refused. Calvillo told Salinas to go get her cousin. Omar told Erik to "go get the 9," which Erik understood to mean Omar's nine-millimeter firearm that was hidden inside the Camry's center console. Omar did not say that he intended to kill Calvillo.

Erik went to get the gun. He walked to the Camry in the parking lot, during which time he could hear Omar and Calvillo arguing loudly. He sat inside the Camry for approximately a half minute, retrieving the gun. He then executed a three-point turn in order to get to the front of the restaurant and drove to the driveway area near the bottom of the ramp. When Omar ran down to the car, Erik handed him the gun and remained inside. He heard multiple gunshots. Omar returned to the car, and Erik drove them away from the scene.

Erik explained he retrieved the gun because he was afraid Calvillo was going to "do something" to him and Omar, and "because of the drugs." He did not know or intend that Omar would kill Calvillo.

b. *Expert testimony*

Dr. John Budny, an expert in the fields of toxicology, pharmacology and biochemistry, testified regarding the effects of drugs and alcohol on the human body. Alcohol, cocaine, and methamphetamine affect cognitive and psychomotor functions. Alcohol lessens a person's "control mechanisms," and methamphetamine can cause aggression and paranoia. All three substances affect a person's ability to reason and reflect on their actions. Persons under the influence of alcohol, methamphetamine, and cocaine would have "grossly impaired" cognitive functions and would be impulsive, unable to think through their actions, and unable to carefully consider prior to

7

making a decision.  The effect of such substances on any individual user depends on numerous variables, including the person's metabolism, how much they have eaten, and their tolerance for the substance.  A person could be cognitively impaired yet still be able to drive a car.  Budny could not definitively opine as to appellants' level of impairment or how the drug and alcohol use affected them.  However, based on the amounts of alcohol appellants reported consuming, they would have been under the influence for purposes of California's driving laws.

Calvillo's autopsy report indicated he had levels of methamphetamine in his blood that could cause behavioral changes such as agitation and restlessness.

4. *Procedure*

A jury convicted both Erik and Omar of the willful, deliberate, and premeditated first degree murder of Calvillo. (Pen. Code, § 187, subd. (a).)[3]  The jury found Omar personally and intentionally discharged a firearm, proximately causing great bodily injury and death.  (§§ 12022.53, subds. (b), (c), (d), 12022.5, subd. (a)(1)).  As to Erik, it found a principal armed allegation true.  (§ 12022, subd. (a)(1)).

Omar admitted serving a prior prison term within the meaning of section 667.5, subdivision (b).  After denying appellants' motions for a new trial, the court sentenced Omar to 25 years to life in prison for the murder, plus a consecutive term of 25 years to life for the section 12022.53, subdivision (d) firearm

---

[3]     All further undesignated statutory references are to the Penal Code.

enhancement.[4]  The court sentenced Erik to 25 years to life in prison.[5]  It imposed a restitution fine, a suspended parole revocation restitution fine, a criminal conviction assessment, and a court operations assessment on both defendants, but stayed all such fines and fees based upon its finding that they lacked the ability to pay.

Appellants filed timely notices of appeal.

DISCUSSION

1. *The evidence was sufficient to prove first degree murder*

Appellants contend the evidence was insufficient to prove the elements of first degree murder.  We disagree.

a. *Applicable legal principles*

When determining whether the evidence was sufficient to sustain a criminal conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104; *People v. Vargas* (2020) 9 Cal.5th 793, 820.)  We presume the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Morales* (2020) 10 Cal.5th 76, 88.)  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Vargas*, at p. 820.)

---

[4]      The court struck the prior prison term enhancement.

[5]      The court imposed but stayed the section 12022 arming enhancement.

9

Murder is of the first degree when it is willful, deliberate and premeditated. (§ 189, subd. (a); *People v. Morales*, *supra*, 10 Cal.5th at p. 88.) Premeditation and deliberation require more than a showing of intent to kill. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) A killing is premeditated and deliberate if it is considered beforehand and occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Morales*, at p. 88; *People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. (*People v. Pearson*, at p. 443; *People v. Disa* (2016) 1 Cal.App.5th 654, 664.) It is "not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of the defendant's act." (§ 189, subd. (d).) The " ' "process of premeditation and deliberation does not require any extended period of time." ' " (*People v. Salazar* (2016) 63 Cal.4th 214*,* 245.) " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citation.]" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

Three categories of evidence are especially probative to establish premeditation and deliberation: planning activity, motive, and manner of killing. (*People v. Dalton* (2019) 7 Cal.5th 166, 248; *People v. Potts*, *supra*, 6 Cal.5th at p. 1027; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.) These so-called *Anderson* factors are not all required, are not exclusive, and need not be accorded any particular weight; instead, they are a framework to guide appellate review. (*People v. Morales*, *supra*, 10 Cal.5th at p. 89.)

b. *Sufficiency of the evidence as to Omar*

Omar argues that the evidence was insufficient to prove he premeditated and deliberated before killing Calvillo. We disagree.

First, the evidence clearly showed planning—the most important of the *Anderson* factors. (See *People v. Alcala* (1984) 36 Cal.3d 604, 627.) Omar did not impulsively pull a gun that was already on his person. Instead, he told Erik—several times—to go retrieve the gun for him. Courts have repeatedly held that evidence a defendant arms himself before an attack supports an inference of planning. In *People v. Salazar, supra*, 63 Cal.4th 214, our Supreme Court reasoned that the defendant's act of telling his companion to get a gun amounted to "substantial evidence of planning." (*Id.* at p. 245.) The same is true here. (See also, e.g., *People v. Elliot* (2005) 37 Cal.4th 453, 471 [evidence defendant armed himself prior to accosting the victim supported finding of planning activity]; *People v. Thomas* (1992) 2 Cal.4th 489, 517 [planning shown by evidence defendant returned to his car to get a rifle before committing murders]; *People v. Wright* (1985) 39 Cal.3d 576, 593 & fn. 5 ["obtaining [a deadly weapon] in advance of a killing is one fact that has been held to support an inference of planning activity"]; *People v. Adcox* (1988) 47 Cal.3d 207, 240 [the " 'fact that defendant brought his loaded gun' " to the scene of the shooting " 'and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance' "].) Omar argues that it cannot reasonably be inferred he had the gun in his car because he planned to use it against Calvillo or anyone else. But the salient point is that he ordered Erik to *go get the gun* and armed himself with it in order to shoot

11

the victim, not that he simply had it in the car when he arrived at the restaurant.

The manner of killing also supported the jury's finding of premeditation and deliberation. Omar fired nine rounds at Calvillo from a few feet away, with no hesitation, hitting him in the torso and leg and inflicting two fatal wounds. (See *People v. Wright*, *supra*, 39 Cal.3d at pp. 593–594 [fact defendant shot victim at close range four times without hesitation "could well support an inference by the jury that the manner of killing was 'particular and exacting' "]; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [multiple gunshots at close range, without a struggle or provocation sufficient to reduce murders to manslaughter, supported inference of premeditation and deliberation]; *People v. Thompson* (2010) 49 Cal.4th 79, 114–115 [where three gunshots were fired from a few feet away, "[t]his manner of killing, a close-range shooting without any provocation or evidence of a struggle, reasonably supports an inference of premeditation and deliberation"]; *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [six shots fired from five feet away supported a finding of premeditation and deliberation].)

The People argue that there was also evidence of motive: Omar was angry at Calvillo based on the way Calvillo spoke to appellants. In support, they cite *People v. Miranda* (1987) 44 Cal.3d 57. There, the victims refused to sell beer to the defendant. The defendant testified he became angry because he believed the men were being rude to him. "The conversation between defendant and his victims suggests that defendant acted with conscious motive and had time to reflect upon his plan to shoot the victims. '[T]he law does not require that a first degree murderer have a "rational" motive for killing. Anger at the way

12

the victim talked to him . . . may be sufficient.' [Citations.]" (*Id.* at p. 87, disapproved on another point in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4; *People v. Jackson* (1989) 49 Cal.3d 1170, 1200 [evidence that defendant became angry when approached by officer demonstrated motive].)

Omar points to *People v. Boatman* (2013) 221 Cal.App.4th 1253, for the proposition that anger arising from a confrontation does not prove a premeditated motive to kill. In *Boatman*, the defendant and the victim, his girlfriend, had been embroiled in a " 'loud screaming argument' " a "couple of minutes" before he shot her. (*Id.* at pp. 1258, 1261, 1268.) *Boatman* rejected the view that the argument showed a preexisting motive suggesting careful thought and reflection. Rather, the evidence indicated a motive to kill based on an unconsidered or rash impulse. (*Id.* at p. 1268.)

The facts of this case more closely resemble *Miranda* than *Boatman*. But even assuming arguendo that *Boatman*'s rationale applies, that does not negate the jury's finding of premeditation and deliberation here. California law "has ' "never required the prosecution to prove a specific motive before affirming a judgment, even one of first degree murder. A senseless, random, but premeditated, killing supports a verdict of first degree murder." [Citation.]' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 421–422; *People v. Orozco* (1993) 20 Cal.App.4th 1554, 1567.)

Omar advances several arguments in support of his contention that the evidence was insufficient. He points out that the whole incident transpired within approximately three minutes. But a plan may be "rapidly and coldly formed" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1070), and "planning activity

13

occurring over a short period of time is sufficient to find premeditation." (*People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Solomon* (2010) 49 Cal.4th 792, 812–813; *People v. Brady* (2010) 50 Cal.4th 547, 563–564 [defendant killed officer during the course of a traffic stop lasting only a few minutes; jury could find he rapidly and coldly formed the idea to kill and acted after reflection rather than on an unconsidered impulse]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658.) Omar had ample time to consider his actions while Erik walked to the parking lot and pulled the Camry to the front of the restaurant. Furthermore, Serrano testified that after Erik left to retrieve the gun, he talked to Omar to try to calm him down; the video of the incident corroborates this account. The jury could infer that Omar must have given thought to his plan to kill when he rejected Serrano's advice.

Omar also relies on the principle that an especially brutal killing may be as consistent with an explosion of rage as with premeditation. (See *People v. Alcala*, *supra*, 36 Cal.3d at p. 626; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118.) But the gunshots in this case are not comparable to the type of injuries courts have characterized as brutal or frenzied. (See *People v. Alcala*, at p. 627 [victim was " 'all cut up' " by multiple stab wounds and had been hit in the head with a blunt object]; *People v. Nazeri*, at p. 1109 [each victim had been stabbed multiple times in the neck, torso, and other areas].) The gunshots in the instant case were purposeful and controlled. The video does not show Omar shot in a frenzy. Instead, he purposefully ran to the car, retrieved the gun, ran back up the ramp, fired shots directly at Calvillo in quick succession—

14

managing to avoid hitting Serrano in the process—and then ran back down the ramp, to the waiting car. And, a restaurant employee who saw the shooting testified that she observed Omar's facial expression as he was firing the gun; he looked like he was "there with a purpose."

Omar further argues that he was intoxicated and had consumed drugs, which—according to testimony by the defense expert—would have caused him to behave impulsively, rather than with premeditation. While there was evidence that Omar ingested drugs and alcohol and was intoxicated, there was also evidence showing that he was not so affected by his drug and alcohol use that he failed to form the requisite mental states. Serrano, who spent at least a half hour with appellants immediately before the shooting, testified that Omar did not appear drunk, did not need help walking, and spoke clearly. Sergeant Jorge Huerta testified that when he stopped the Camry, both appellants obeyed instructions, gave appropriate responses to his questions, and did not display any bizarre behavior. Most significantly, the video footage suggested Omar was not impaired; he purposefully retrieved the gun, managed to disengage its safety features, and sufficiently aimed at the victim to hit him five times, while avoiding hitting Serrano or any of the other persons in the vicinity. Thus, the effect of his voluntary intoxication was a question for the jury. (See *People v. Lewis* (2001) 25 Cal.4th 610, 643–644.)

The same is true in regard to Omar's argument that he only wanted the gun as a display of authority and control, or for protection if Calvillo attacked him. For one thing, this argument is completely at odds with the undisputed evidence: Omar ran to get the gun, returned to the restaurant entrance, and shot

15

Calvillo without warning.  For another, this argument amounts to a request that this court reweigh the evidence and substitute our judgment for the jury's.  The fact the evidence might have been reconciled with a contrary finding does not warrant reversal.  (*People v. Vargas*, *supra*, 9 Cal.5th at p. 820.)

c. *Sufficiency of the evidence as to Erik*

It was undisputed that Erik was not the actual killer.  To prove his guilt of first degree murder as an aider and abettor, the People had to show:  (1) he knew of Omar's unlawful purpose; (2) he intended to commit, encourage, or facilitate the murder; (3) by act or advice he aided, promoted, encouraged, or instigated the crime; and (4) he did so willfully, deliberately, and with premeditation.  (*People v. Penunuri* (2018) 5 Cal.5th 126, 146–147; *People v. Chiu* (2014) 59 Cal.4th 155, 166–167, superseded by statute on another point as stated in *People v. Gentile* (2020) 10 Cal.5th 830, 849; *People v. Lara* (2017) 9 Cal.App.5th 296, 318.)

There is no question Erik's actions aided and encouraged the murder:  he handed Omar the gun, waited with the car's engine on while Omar committed the murder, and drove Omar away seconds after the murder.  Thus, the only questions were whether he knew Omar intended to kill Calvillo, intended to assist him in that goal, and premeditated the killing.

Intent and knowledge generally must be proved circumstantially.  (See *People v. Thomas* (2011) 52 Cal.4th 336, 355 ["Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially."].)  There was ample circumstantial evidence to prove those elements here.  Erik knew Omar was angered by Calvillo's comments.  Omar ordered Erik, several times, to "go get the 9."  From this evidence

alone, the jury could infer Erik knew of Omar's intent to kill: why else would Omar need his gun under these circumstances? Serrano and Salinas both testified that Calvillo did not make any threats to Omar or Erik, undercutting any inference that Omar thought he might need the gun for self-defense.

Further, Erik did not simply go retrieve the gun from the car and bring it to Omar, as would be expected if he thought Omar intended to use it in a non-homicidal fashion. Instead, Erik drove the Camry to the front of the restaurant and positioned it at the driveway. He did not turn the motor off or join Omar on the ramp. As Omar ran back up the ramp with the gun, Erik stepped partially out of the driver's seat; when shots were fired, he immediately sat down and closed the door, without any visible show of surprise or dismay. The most logical inference from this evidence was that Erik knew he and Omar would need to make a quick getaway because Omar intended to shoot Calvillo. And, Erik had sufficient time to premeditate the murder as he walked to the car, sat inside while getting the gun, and drove to the front of the restaurant.

The jury was not required to credit the defense's voluntary intoxication theory. As with Omar, there was evidence from which the jury could conclude that, despite Erik's use of alcohol and drugs, he premeditated and intended the killing. Erik testified that cocaine usually made him "wanna keep drinking," but that night "the cocaine was not doing its effect anymore." Serrano testified that both appellants "looked fine to me. They didn't look drunk or nothing." In preparation for the killing, Erik was able to find the Camry in the parking lot, make a three-point turn, and position the car for escape without difficulty. Sergeant Huerta followed the Camry for approximately three minutes

17

before stopping it; he observed nothing suggesting that Erik was having difficulty driving. When stopped, Erik obeyed instructions, gave appropriate responses to Huerta's questions, and did not display any bizarre behavior. Thus, while there was significant evidence that Erik had consumed alcohol and drugs, the jury was not required to accept the defense theory that he lacked the requisite mental states as a result.

As to Erik's contention that any showing of intent and premeditation was negated by Calvillo's purported provocation, the jury was entitled to reject this argument. Erik acknowledges that he did not argue with Calvillo, and there was no evidence he "shared Omar's anger." Salinas testified that it was not fair to characterize the interchange as a "heated conversation." Omar, not Calvillo, precipitated the confrontation by making derogatory remarks about women. Serrano testified that he did not feel intimidated by Calvillo, and did not expect the situation to escalate. Significantly, Erik left to get the gun within 40 seconds after he and Omar went outside the restaurant. In short, there was evidence the jury could have relied on to reject the argument that Erik's reason was clouded due to provocation.

Erik further argues that he had only known Omar for six weeks prior to the shooting, and had no reason to believe Omar had violent tendencies; he could not have known Omar intended to kill, rather than merely assault or "subdue" Calvillo; there was no evidence he told Omar to shoot; and he was not personally involved in the argument, and therefore had no motive to kill. These arguments amount to a request that this court reweigh the evidence and substitute our judgment for the jury's. This we cannot do. As noted above, where, as here, the evidence reasonably justifies the jury's findings, the judgment may not be

18

reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Solomon, supra*, 49 Cal.4th at p. 816; *People v. Harris* (2013) 57 Cal.4th 804, 849–850.)

   2. *Denial of continuance*

   Appellants contend that the trial court abused its discretion by declining to grant a mid-trial continuance to allow the defense to secure the attendance of a witness, in violation of their rights to present a defense, the effective assistance of counsel, due process, and a fair trial. We disagree.

   a. *Additional facts*

   On Wednesday, October 17, 2018, during Erik's testimony, counsel for Omar advised the court that Guadalupe M., one of the women who had been with appellants at the Ramada and Mariscos restaurants, and who had been expected to appear as a witness for the defense, had been admitted to the hospital earlier that morning and was having emergency surgery the next day. Joined by Erik's counsel, he averred that Guadalupe was a necessary witness because "she was the topic of cross examination" by the prosecutor, and "she was with Erik Perez and saw the conduct and various things that happened inside the bar." It was unknown when she would be available to testify. Appellants asked the court to continue the trial until she became available at some unspecified point in the future, or grant a mistrial.

   The trial court denied the requests, explaining it would not "recess a trial in hopes that a witness who is undergoing surgery will somehow be medically cleared to testify at some unknown date in the future and keep this case ongoing until that is known." Observing that Guadalupe was not a witness to any of

19

the events outside the restaurant and her testimony appeared somewhat cumulative, the court reasoned that her absence would not deny appellants a fair trial. Before the defense rested, Erik's counsel renewed the request, arguing that Guadalupe had relevant information regarding appellants' drug and alcohol use. The court again denied the request.

Approximately three months after trial concluded, appellants brought motions for a new trial, based on, among other things, the court's denial of the continuance. Appellants argued that Guadalupe witnessed their drug use, the extent of which had been questioned by the prosecutor. Omar further complained that the prosecutor had argued that appellants' anger that evening was due to the fact Guadalupe and her friend had spurned their advances, and Guadalupe would be able to rebut this contention. The trial court denied the new trial motions, finding that Guadalupe's testimony was cumulative and the defense had suffered no prejudice.

> b. *Discussion*

A continuance in a criminal trial may only be granted for good cause, and the trial court has broad discretion to determine whether good cause exists. (§ 1050, subd. (e); *People v. Alexander* (2010) 49 Cal.4th 846, 934; *People v. Mungia* (2008) 44 Cal.4th 1101, 1118; *People v. Doolin*, *supra*, 45 Cal.4th at p. 450.) " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' [Citations.]" (*People v. Mungia*, at p. 1118; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1181, overruled on another ground in *People v. Rangel* (2016) 62

Cal.4th 1192, 1216.) " 'The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked.' " (*People v. Hajek and Vo,* at p. 1181.) "Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*People v. Doolin,* at p. 450.) " '[O]nly an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 508.)

When a continuance is sought to secure the attendance of a witness, the defendant must establish that (1) he or she exercised due diligence to secure the witness's attendance; (2) the witness's expected testimony was material and not cumulative; (3) the testimony could be obtained within a reasonable time; and (4) the facts to which the witness would testify could not otherwise be proven. (*Jensen v. Superior Court* (2008) 160 Cal.App.4th 266, 270.) The court "must consider ' " 'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " ' [Citation.]" (*People v. Doolin, supra,* 45 Cal.4th at p. 450; *People v. Mora and Rangel, supra,* 5 Cal.5th at p. 509.)

There was no abuse of discretion here. Despite appellants' characterization of their request as asking for a "short" continuance, in fact there was no showing of when Guadalupe might be available to testify.[6]

---

[6]     Erik speculates that Guadalupe's surgery was likely to have been performed laparoscopically, and therefore it was a

21

There was also an insufficient showing her testimony would have been material and noncumulative. Guadalupe did not witness the shooting, or the interaction between Calvillo and appellants; it was undisputed that she had left the restaurant before then. It was also undisputed that there was no conflict or significant interaction between Calvillo and appellants inside the restaurant, so her testimony could not have been probative in that regard.

As to appellants' drug use, Erik testified he used cocaine in the restroom. Presumably Guadalupe did not follow him into the men's room, and therefore could not have given an account of his actions there. There was considerable evidence in the record, including that offered by the People, that appellants had consumed alcohol and drugs. A detective testified that a witness informed him that one or both of the defendants were using methamphetamine or cocaine inside the restaurant. Salinas testified that at Mariscos, she observed appellants go to the restroom multiple times, with unusual frequency. The trial court

matter of "common knowledge" that she would have been available within a few days. But when appellants requested the continuance, they represented that they had very limited information and did not know her medical status. Neither defense counsel described the nature of the surgery until the motions for new trial, months after trial concluded. Even then, no definitive information was provided: Omar's counsel stated that the witness had been "having emergency surgery to remove some type of internal organ, I don't recall specifically what it was but it was her gall bladder or appendix, something like that." We cannot properly accept speculative assumptions about her possible recovery period, especially when they were not shared with the trial court when the continuance request was made.

pointed out, in denying the new trial motion, that the video footage showed appellants holding beers or alcoholic beverages in their hands in the restaurant. When Calvillo encountered appellants outside the restaurant, he said to them, "you guys are drunk." When Sergeant Huerta stopped the Camry shortly after the shooting, he observed that appellants had bloodshot and watery eyes and smelled of alcohol, and he believed they were under the influence. When arrested, Omar had cocaine on his person, and Erik dropped methamphetamine in the police car. And, Erik testified at length regarding appellants' drug and alcohol use, as recited in the statement of facts, *ante*. In short, there is little chance any additional observations by Guadalupe would have made much difference to the defense case. The prosecutor argued that appellants' actions and demeanor demonstrated they could still premeditate and deliberate, regardless of the substances they ingested. Corroboration that the men drank or that Omar used drugs while at the table would have done little or nothing to rebut the prosecutor's point.

Contrary to Omar's argument below, Guadalupe could not have testified as to why he was angry after she and her friend left. Any thoughts she might have had on the subject would have been speculative. In any event, Omar's counsel was the one who elicited, during examination of Erik, that Omar was upset because he had spent money on the women, and then they left. And, whether his ire was provoked by Guadalupe and her friend, or by some other woman, was not significant.

In sum, the trial court's ruling was neither arbitrary nor unreasonable, appellants were not prevented from presenting their intoxication defense, and no prejudice is apparent. For the

same reasons, the motions for new trial, insofar as they were based on these contentions, were properly denied.

3. *Admission of a photograph of the victim with his son*

Appellants next contend that the trial court abused its discretion by allowing the prosecutor to introduce a photograph of Calvillo with his young son, in violation of their rights to due process and a fair trial.

a. *Additional facts*

Near the start of Salinas's direct examination, the prosecutor elicited, without objection, that Calvillo was her fiancé and they had two children together, a six-year-old son and a three-year-old daughter. The prosecutor then offered a photograph of Calvillo with his son, "[j]ust so the jury is aware of who we're talking about and [Salinas's] relationship with that person." Omar's counsel's objected that the photo was irrelevant and would only inflame the jury's emotions. The court overruled the objection, reasoning: (1) there was already evidence in the record that Calvillo and Salinas had children together; (2) evidence of their relationship and the fact they had children would help explain Salinas's demeanor and ability to perceive and recollect events; and (3) there was "nothing prejudicial" about the photograph, which was not inflammatory.

During closing argument, the prosecutor apparently included the photograph of Calvillo in a power point presentation. Omar's counsel requested a mistrial, arguing that the photo was "used to plead to the emotion of the jury." The trial court responded that it was relevant to prove Calvillo was a human being—an element of the crime—and to explain Salinas's demeanor while testifying. It acknowledged, "for purposes of closing, maybe it should not have been used in [the] way it was

24

because it was more an issue of evoking a sympathy factor which is improper for the jury to consider." Noting that the jury had been instructed not to allow emotion or sympathy to shape its verdict, the court denied the request for a mistrial.

The trial court subsequently denied Omar's motion for a new trial, in which he again argued that admission of the photograph infringed his right to a fair trial.

b. *Discussion*

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, §§ 351, 210; *People v. Tully* (2012) 54 Cal.4th 952, 1010.) A trial court has broad discretion to determine whether evidence is relevant and substantially more prejudicial than probative. (Evid. Code, § 352; *People v. Sanchez* (2019) 7 Cal.5th 14, 54.) "Courts should be cautious . . . about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims. [Citation.] But the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant. [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 331–332.) We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Duong* (2020) 10 Cal.5th 36, 64–65.)

Appellants contend that the photograph was irrelevant, cumulative, and unduly prejudicial. They argue there was no dispute Calvillo was a human being, the photo was unnecessary to explain Salinas's testimony, and the depiction of Calvillo's son was likely to "deeply upset" jurors and "ignite emotional biases" against appellants. The People counter that the photo was relevant to prove Calvillo's identity, and was not especially likely

25

to evoke sympathy beyond that which was inherent in Salinas's testimony.

We need not determine which party is correct because, even assuming arguendo that the photograph should have been excluded, any error was manifestly harmless. (See Evid. Code, § 353, subd. (b) [erroneous admission of evidence does not require reversal unless the error caused a miscarriage of justice]; *People v. Richardson* (2008) 43 Cal.4th 959, 1001.) We have examined the single photograph in question and do not find it likely to have evoked an emotional bias against appellants. It is not inflammatory; it simply shows Calvillo, smiling, with a young toddler or baby, in front of a nondescript background. (See *People v. Harris*, *supra*, 37 Cal.4th at p. 332 [short videotape of the victim at a children's birthday party did "not engender an emotional reaction but [was] neutral and unremarkable."].) The jury was already aware, via unchallenged evidence, that Calvillo had two young children. The photograph thus conveyed nothing more than the jury already knew. Although the photograph was apparently shown in a power point presentation during closing, the prosecutor made no argument regarding it. Furthermore, the jury was instructed not to allow bias, sympathy or prejudice to influence its decision, a precept we presume jurors followed. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1345; *People v. Martinez* (2010) 47 Cal.4th 911, 957.) There is no reasonable possibility that admission of the photo lessened the reliability of the verdict. For the same reasons, the trial court did not err by denying Omar's motion for a new trial insofar as it raised this claim of error.

4. *Alleged instructional errors*

Appellants raise several claims of instructional error. None has merit.

a. *Failure to instruct on heat of passion voluntary manslaughter*

The trial court instructed the jury on first and second degree murder, homicide in self-defense, voluntary manslaughter on an imperfect self-defense theory, provocation, and the effect of voluntary intoxication. It rejected appellants' requests to instruct on voluntary manslaughter on a heat of passion theory, finding that there was insufficient evidence of legally sufficient provocation. Appellants contend the trial court's ruling was prejudicial error that violated their rights to due process and a fair trial. We disagree.

(i) *Applicable law*

A trial court must instruct on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses. (*People v. Smith* (2013) 57 Cal.4th 232, 239.) Instruction on a lesser included offense is required when there is evidence the defendant is guilty of the lesser, but not the greater, offense. (*People v. Whalen* (2013) 56 Cal.4th 1, 68.) This duty is not satisfied by instructing on only one theory of an offense if other theories are supported by the evidence. (*People v. Lee* (1999) 20 Cal.4th 47, 61.) Substantial evidence is evidence a reasonable jury could find persuasive. (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.) The existence of *any* evidence, no matter how weak, will not justify an instruction. (*People v. Whalen*, at p. 68.)

We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense.

27

(*People v. Nelson* (2016) 1 Cal.5th 513, 538.)  In making this determination, we do not evaluate the credibility of the witnesses.  (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.)  We view the evidence in the light most favorable to the defendant.  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; *People v. Larsen* (2012) 205 Cal.App.4th 810, 824.)

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser included offense of murder.  (§ 192, subd. (a); *People v. Moye* (2009) 47 Cal.4th 537, 549.)  A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation.  (*People v. Lee*, *supra*, 20 Cal.4th at p. 59.)  "The heat of passion sufficient to reduce murder to manslaughter 'exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " ' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 97; *People v. Moye, supra*, 47 Cal.4th at pp. 549–550; *People v. Lee*, *supra*, 20 Cal.4th at p. 59; *People v. Manriquez* (2005) 37 Cal.4th 547, 583; *People v. Beltran* (2013) 56 Cal.4th 935, 939.)

(ii)  *The court correctly found there was insufficient evidence to support the instruction*

The trial court did not err by refusing the proposed heat of passion instruction, because there was insufficient evidence to support it.  As to Erik, there was a dearth of evidence suggesting he actually acted due to passion rather than judgment.  Omar was the one making the derogatory remarks about women; there

28

was no evidence Erik engaged in a significant verbal dispute with Calvillo. The video showed that Erik left to get the gun less than a minute after he and Omar encountered Calvillo and Salinas. Nothing about Erik's demeanor, as shown in the video, suggested he was angry or upset. Erik testified that he retrieved the gun because he was afraid Calvillo would fight or harm him or Omar, not because he was angry or provoked.[7] When asked what he was thinking when he placed the loaded gun in Omar's hand, Erik replied, "I didn't think anything. I was on drugs."

There was also insufficient evidence, as to both defendants, of legally sufficient provocation by the victim. Viewing the evidence in the light most favorable to the defense, and crediting Erik's testimony, Calvillo seemed angry; said "shut up, you guys are drunk" to the men; stepped toward them; loudly argued with Omar; and threatened to "beat the shit out of" Erik and Omar.

On the facts of this case, none of these actions amounted to sufficient provocation. The video shows that the argument lasted for less than a minute before Omar told Erik to get the gun.

---

[7] Erik argues that the jury might have concluded his purported fear established heat of passion. It has been held that strong fear or panic can, in an appropriate case, provide evidence a defendant's reason was obscured by "extreme emotion," even though such evidence is more consistent with imperfect self-defense. (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 645; *People v. Millbrook*, *supra*, 222 Cal.App.4th at pp. 1140–1141.) But the evidence of fear, panic, and provocation in this case bears no resemblance to the much stronger evidence in *Thomas* and *Millbrook*. In any event, the jury was instructed that provocation could reduce the degree of murder; had it believed Erik was acting rashly because of his fear, it would have convicted him of second degree murder or voluntary manslaughter.

Simply confronting Omar about his derogatory comments regarding women does not amount to legally sufficient provocation.  Legally sufficient provocation "must go beyond 'mundane annoyances,' even if they might make an ordinary person 'act[ ] imprudently or out of anger.'  [Citation.]  Heat of passion requires 'extreme intensity.' " (*People v. McShane* (2019) 36 Cal.App.5th 245, 255–256, rev. granted on another ground, Sept. 18, 2019, S257018, rev. dismissed Aug. 26, 2020.)  Legally adequate provocation cannot be based on mere hard looks and taunting words.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [voluntary manslaughter instruction not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching].)  Even a simple assault, such as a tussle, does "not rise to the level of provocation necessary to support a voluntary manslaughter instruction." (*People v. Gutierrez*, at p. 827; see *People v. Manriquez*, *supra*, 37 Cal.4th at p. 586 [calling defendant a " 'mother fucker,' " and daring him to use his weapon if he had one, "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment"]; *People v. Najera* (2006) 138 Cal.App.4th 212, 216, 226 [being called a " 'faggot' " would "not drive any ordinary person to act rashly or without due deliberation"].)

There was no preexisting history of animosity between the victim and appellants that might have suggested heat of passion; they had never met before.  It was undisputed that the victim did not physically accost, touch, or lunge at either Erik or Omar; he simply took a step toward them with his arms at his sides.  The video shows that after Erik left to retrieve the gun, Calvillo took no action toward Omar that could be considered hostile or

aggressive.[8]  Legally sufficient provocation "requires more than evidence that a defendant's passions were aroused.  The facts and circumstances must be ' "sufficient to arouse the passions of the ordinarily reasonable man." ' [Citation.]" (*People v. Nelson, supra*, 1 Cal.5th at p. 539.)  Accordingly, there was insufficient evidence to support a heat of passion instruction.

               (iii)  *Even if error, omission of the instruction was harmless*

Further, assuming for the sake of argument that the instruction should have been given, the jury's first degree murder verdicts demonstrate that its omission was harmless.  Error in failing to instruct on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to the defendant under other, properly given instructions.  (*People v. Manriquez, supra*, 37 Cal.4th at p. 582; *People v. Lewis, supra*, 25 Cal.4th at p. 646; *People v. Peau* (2015) 236 Cal.App.4th 823, 830.)

Appellants' jury was instructed with CALCRIM No. 522 that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The

---

[8]     Appellants argue that Calvillo was "pacing back and forth in an agitated manner as he argued loudly and moved closer to the group."  We have examined the videotape of the murder, and, viewing it in the light most favorable to the defense, it simply does not show that Calvillo was moving in a hostile or menacing fashion.  Appellants also argue that provocation existed because Calvillo told Salinas to go get her cousin, which appellants assumed meant Calvillo was "getting backup."  While this fact is relevant to a self-defense or imperfect self-defense theory, it has little bearing on the question of provocation.

31

weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendants committed murder but were provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."  It was also instructed in regard to premeditated and deliberate murder—the only theory of first degree murder at issue—that it could not find premeditation and deliberation unless the People proved beyond a reasonable doubt that appellants "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill."  The instruction further advised that a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (CALCRIM No. 521.)

In *People v. Wharton* (1991) 53 Cal.3d 522, the jury was given comprehensive instructions on provocation and heat of passion, but the trial court improperly refused a defense request that it also instruct that provocation could arise over time.  (*Id.* at pp. 569–572.)  *Wharton* found the error harmless, explaining: "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing.  This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*Id.* at p. 572.)  Other cases are in accord.  (*People v. Franklin* (2018) 21 Cal.App.5th 881, 894; *People v. Peau, supra,* 236 Cal.App.4th at p. 830 [first-degree

32

murder conviction rendered any failure to give heat-of-passion instruction harmless]; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1246; *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1138 [verdict that a murder was willful, premeditated, and deliberate is manifestly inconsistent with heat of passion].)**9**

The same analysis applies here. "We cannot see how a determination that [defendant] carefully weighed his choice to act and did not decide rashly or impulsively can coexist with the heat of passion, which 'arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act *rashly and without deliberation* and reflection, and from such passion rather than from judgment." ' [Citation.]" (*People v. Franklin*, *supra*, 21 Cal.App.5th at p. 894.)

---

**9** In *People v. Berry* (1976) 18 Cal.3d 509, a case predating *Wharton,* the court found the failure to give a heat of passion instruction was not rendered harmless despite the fact the defendant was convicted of first degree murder. (*Id.* at p. 518; see *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 [rejecting argument that conviction of first degree murder rendered the failure to give a heat of passion instruction harmless in light of *Berry*].) *People v. Peau*, acknowledging that there was "some tension" between *Berry* and *Wharton,* reasoned that the cases could "be reconciled and that *Wharton*'s more recent reasoning" applied. (*People v. Peau*, *supra*, 236 Cal.App.4th at p. 831.) Relying on the principle that cases are not authority for propositions not considered, *Peau* explained that *Berry* never analyzed the question of whether the error was harmless in light of the first degree murder finding. (*Peau*, at pp. 831–832.) *People v. Franklin* agreed with *Peau*. (*People v. Franklin*, *supra*, 21 Cal.App.5th at p. 894.) We do the same.

Given that the trial court properly declined to instruct the jury on heat of passion voluntary manslaughter, and omission of the instruction was harmless in any event, the court also properly denied appellants' motions for new trial insofar as they were premised on this contention.

b. *Failure to instruct on unanimity regarding the degree of murder*

Appellants argue that the trial court erred by failing to instruct the jury that it must unanimously agree on the degree of murder. This claim lacks merit.

We independently review a claim of instructional error. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We "must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*Ibid.; People v. O'Malley* (2016) 62 Cal.4th 944, 991.)

The People are correct that this claim has been forfeited because appellants did not object or seek a clarifying instruction below. (See *People v. O'Malley*, *supra*, 62 Cal.4th at p. 991.) Although a defendant may raise a claim that his substantial rights were affected by instructions to which he did not object (see § 1259; *People v. Anderson* (2007) 152 Cal.App.4th 919, 927), as we explain, appellants fail to make such a showing here.[10]

---

[10] Appellants fail to persuade us that the trial court had a sua sponte duty to give a unanimity instruction in addition to the instructions it provided. (See *People v. Kozel* (1982) 133 Cal.App.3d 507, 528–529.) The cases cited pertain to situations

34

In general, jurors need not unanimously agree on the *theory* underlying a first degree murder verdict (*People v. Potts*, *supra*, 6 Cal.5th at p. 1048), but they must unanimously agree on the *degree* of murder. (*People v. Taylor* (2010) 48 Cal.4th 574, 626; *People v. Johnson* (2016) 243 Cal.App.4th 1247, 1278.) Here, the trial court provided adequate instructions to inform the jury of that principle. CALCRIM Nos. 520 and 521 informed jurors that if they found a defendant committed murder, it was in the second degree unless the People proved otherwise beyond a reasonable doubt. CALCRIM No. 3550 informed jurors that "Your verdict on each count *and any special findings must be unanimous. This means that, to return a verdict, all of you must agree to it.*" (Italics added.) The verdict form set forth the jury's finding regarding the degree of murder separately from its finding of murder, stating: "We further find willful, deliberate and premeditated murder in the FIRST DEGREE to be: TRUE." After the verdicts were read—including the finding that the murder was in the first degree, using the verdict form's language—the jurors were polled. Each stated that this was his or her verdict. Nothing in the parties' arguments at trial suggested the jury could find the murder to be in the first degree if all jurors did not agree. We presume jurors are intelligent

---

in which the People presented evidence of more than one discrete act that could have been the basis for a single count. In that situation, either the court must instruct the jury that it must unanimously agree on which specific act constituted the crime, or the prosecutor must elect the specific act relied upon to prove the charge to the jury. (See *People v. Jo* (2017) 15 Cal.App.5th 1128, 1178.) But that was not what transpired here: there was only one act that constituted murder.

persons, capable of understanding and correlating the instructions given. (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 991.) Reasonable jurors in this case would have understood they had to unanimously agree on the degree of murder.

*People v. Thomas* (2012) 53 Cal.4th 771, is instructive. The defendant there argued that the trial court erred by failing to timely instruct with CALJIC No. 8.74, which stated that the jury must unanimously agree on the degree of murder. *Thomas* concluded that the instructions initially given properly informed the jury of the unanimity requirement. (*Thomas*, at pp. 815–816.) Those instructions—that the jury had to state in the verdict form whether " 'you find the murder to be of the first or second degree,' " and that all jurors must "agree to the decision and to any finding you have been instructed to include in your verdict"—are similar to those given here. (*Id.* at p. 816.)

Appellants' citations to *People v. Sanchez* (2013) 221 Cal.App.4th 1012, and *People v. Johnson*, *supra*, 243 Cal.App.4th 1247, do not assist them. In those cases, the juries were instructed that they need not unanimously agree on the theory of murder, where the two theories presented led to different degrees of murder. (*People v. Sanchez*, at p. 1024; *People v. Johnson*, at pp. 1279–1280.) Here, in contrast, the jury was only given one theory of first degree murder: premeditation and deliberation. And, it was never instructed that its verdict on the degree of murder need not be unanimous.[11]

---

[11] For the first time in his reply brief, Erik asserts that the trial court incorrectly instructed with a modified version of CALCRIM No. 642, rather than with CALCRIM Nos. 640 or 641, which he suggests would have more clearly stated the unanimity requirement. Erik has forfeited this claim by failing to raise it in

c. *Response to jury questions*

Erik next asserts that the trial court improperly responded to several questions posed by the jury during deliberations. Erik has forfeited this claim, and fails to establish ineffective assistance of counsel.

(i) *Additional facts*

During deliberations, the jury sent the following note to the court: "Is Eric guilty of Murder 2 now? [¶] Is there a[n] option of Murder 2 besides 1st degree & voluntary manslaughter? [¶] What is imperfect manslaughter?"

Observing that the questions were "a little confusing," the trial court met with the parties to formulate appropriate responses. The court expressed concern that asking the jury to elaborate on what the questions meant might invade the jury's province and "get into . . . issues that they are experiencing in the deliberation room." It proposed to refer the jury to the instructions given, explain that there is no such crime as imperfect manslaughter, reiterate the principle that a defendant is presumed innocent, and confirm that Erik was not guilty unless the jury unanimously found him so.

Omar's counsel concurred that the jury should be referred to the instructions and reminded of the presumption of innocence. Erik's counsel stated, "I would ask that the court go with the

_____

his opening brief. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408; *People v. Tully, supra,* 54 Cal.4th at p. 1075; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1030, fn. 8.) For the same reason, Erik has also forfeited his contention that the language in the verdict form does not show the jury actually found he personally premeditated and deliberated, because the form uses "the passive, not active, voice."

response that I heard Your Honor articulate, which [as to the first question] is no, not unless you unanimously decided he's guilty of second degree murder without a reasonable doubt." Counsel expressed concern that referring jurors to specific instructions might signal that some instructions were more significant than others; therefore, counsel asked the court to avoid specifically referencing the instruction regarding aider and abettor liability.

When the jury was brought into the courtroom, the trial court responded to the first question by reminding jurors that "the defendants are presumed to be not guilty. They are presumed to be innocent," and could be convicted only if "a jury is convinced beyond a reasonable doubt that a defendant is guilty of the charged crime. In this case, murder which has been charged. So to answer the question, 'is [Erik] guilty of Murder two now?' My simple response is . . . only unless the jury finds otherwise beyond a reasonable doubt. And until or unless a unanimous decision is made by that jury as to [Erik] in the crime of murder, he is presumed to be not guilty."

As to the second question, the court provided this response: "[I]s there a[n] option besides murder two, first-degree, or voluntary manslaughter and the . . . simple answer is yes, and it's not guilty if the jury finds that the evidence of the trial leaves you with a reasonable doubt as to whether either one or both defendants are guilty of murder, first degree, second degree, or voluntary manslaughter. So there is an option and it would be not guilty."[12]

---

[12] Regarding the third question, the court stated that there is no such crime as imperfect manslaughter, and gave a brief explanation of voluntary manslaughter based on imperfect self-

While answering the questions, the court twice reiterated that the jury could ask additional questions if it wanted further clarification. It also advised that the jury could also ask for readback of testimony, or additional argument from the parties on specific points. Neither defense counsel expressed any concern about or objection to the court's responses. The jury did not pose additional questions or ask for further argument.

(ii) *Discussion*

Erik contends the trial court provided "misleading and prejudicial" responses to the jury's questions. In his view, implicit in the queries was the issue of whether Erik could be convicted of second degree murder, even if Omar was guilty of a greater offense. (See *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 917 [an actual killer and an aider/abettor are not always guilty of the same offense]; *People v. Nero* (2010) 181 Cal.App.4th 504, 518 [aider and abettor can be guilty of a lesser offense than the perpetrator].) He argues that the court should have recognized the true import of the questions, and his counsel should have offered clarifying instructions.

When a jury asks a question after retiring for deliberations, section 1138 requires that the court provide information the jury desires on points of law, and help it understand the legal principles it is asked to apply. (*People v. Hodges* (2013) 213 Cal.App.4th 531, 539; *People v. Montero* (2007) 155 Cal.App.4th 1170, 1179.) " 'This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has

---

defense. Erik does not challenge the court's response to this question.

discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky." [Citation.]' " (*People v. Montero*, at p. 1179; *People v. Williams* (2015) 61 Cal.4th 1244, 1267.) " 'We review for abuse of discretion any error under section 1138' " (*People v. Hodges*, at p. 539), and review de novo the accuracy of any supplemental instructions provided. (*People v. Franklin, supra*, 21 Cal.App.5th at p. 887.)

Erik has forfeited any claim of error. " 'When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 699; *People v. Dykes* (2009) 46 Cal.4th 731, 802.) *People v. Shoals* (1992) 8 Cal.App.4th 475, 489, and *People v. Ross* (2007) 155 Cal.App.4th 1033, 1048–1049, cited by Erik, do not suggest a different conclusion. In both cases, the court provided a response to the jury's questions without consulting defense counsel. For obvious reasons, under those circumstances, there was no forfeiture, but such is not the case here. Defense counsel not only remained silent, but expressly approved of the court's responses.

In light of this forfeiture, Erik contends his attorney provided ineffective assistance. To establish such a claim, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that,

40

but for counsel's errors, the result of the proceeding would have been different. (*People v. Bell* (2019) 7 Cal.5th 70, 125–126; *People v. Brown* (2014) 59 Cal.4th 86, 109.)

Contrary to Erik's argument, it was not "obvious" that the jury intended to ask whether an aider and abettor could be convicted of a lesser offense than the perpetrator. This meaning is not readily apparent from the text of the jury's questions, which were less than straightforward. Erik nonetheless argues that his counsel should have understood that the jury's first question reflected its belief that Erik was less culpable than Omar, but was unsure whether it could convict him of a lesser offense. As to the second question, he argues that the court's response indicated the only options were acquittal or first degree murder, thereby "direct[ing] a finding of first degree murder." Thus, according to Erik, counsel provided ineffective assistance by failing to request clarifying instructions.

We disagree. Erik's contention that the court's response directed a verdict of first degree murder is inaccurate. The court expressly stated that the jury must find Erik not guilty if it had a reasonable doubt whether "either one or both defendants" were guilty of "first degree, second degree, or voluntary manslaughter." The court thus conveyed that defendants could be convicted of several different offenses, and also telegraphed that second degree murder was an option for Erik. Counsel thus had no basis to object on this ground.

Counsel's failure to request amplification of the instructions was a legitimate tactical choice. A reviewing court will reverse a conviction based on ineffective assistance grounds only if there is affirmative evidence that counsel had no rational tactical purpose for an action or omission, was asked for a reason

41

and failed to provide one, or there could be no satisfactory explanation. (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; *People v. Mai* (2013) 57 Cal.4th 986, 1009.) We accord great deference to tactical decisions and presume that counsel's actions fell within the broad range of reasonableness and can be explained as a matter of sound trial strategy. (*People v. Mickel* (2016) 2 Cal.5th 181, 198; *People v. Bell*, *supra*, 7 Cal.5th at p. 125.)

Erik's primary argument was that the killing was manslaughter, based on defendants' intoxication and an imperfect self-defense theory; he also contended that he was not an aider and abettor because he did not know and did not share Omar's murderous intent. In light of the defense theories, counsel may have wished to avoid highlighting or seeming to agree that Erik could be convicted of second degree murder, hoping instead the jury would go with a voluntary manslaughter verdict, or acquittal. We cannot say this tactical choice was unreasonable. Thus, even assuming arguendo that Erik's counsel should have intuited a deeper meaning in the jury's questions, his choice to forgo further instruction on second degree murder was not unreasonable.

5. *Prosecutorial misconduct*

Appellants contend the prosecutor committed prejudicial misconduct during argument by improperly conflating the issues of intent and premeditation, using a misleading example, and suggesting premeditation could occur in an instant, all in violation of their rights to due process, a fair trial, and a reliable jury verdict. We discern no reversible error.

a. *Applicable legal principles*

"In California, the law regarding prosecutorial misconduct is well settled: 'When a prosecutor's intemperate behavior is

42

sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citation.]" (*People v. Masters* (2016) 62 Cal.4th 1019, 1052.)  When a claim of misconduct is based on the prosecutor's arguments, we consider whether there is a reasonable likelihood the jury construed or applied the challenged remarks in an objectionable fashion.  (*People v. Woodruff* (2018) 5 Cal.5th 697, 755.)  We consider the statements in context, and view the argument and instructions as a whole.  (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)  An advocate has "significant leeway in discussing the legal and factual merits of a case during argument," but it is misconduct for a prosecutor to misstate the law.  (*Id.* at p. 666; *People v. Bell*, *supra*, 7 Cal.5th at p. 111.)

b.  *Forfeiture*

To preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.  (*People v. Powell* (2018) 6 Cal.5th 136, 182.)  Here, neither defense counsel objected to the challenged portions of the prosecutor's argument, and appellants' claims have been forfeited.  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 893–894; *People v. Centeno*, *supra*, 60 Cal.4th at p. 674.)  In light of this forfeiture, appellants contend their attorneys provided ineffective assistance.  We have set forth the relevant principles regarding such a claim, *ante.*

### c. *Statements during argument*

During argument, the prosecutor argued that where intent to kill was proven, "the crime can . . . be elevated to first-degree murder if you have the additional elements of deliberation and premeditation." She explained the killer "doesn't need to be deep in thought for a set period of time for that killing to be deliberate," and a "cold calculated decision to kill can be reached quickly." Here, the killing "was intended. It was thought about. It was executed." She continued: "Now, we ask was the killing premeditated? What premeditation is is did Omar decide to kill before he committed the act that essentially killed [Calvillo]? Did he decide he was going to kill before pulling the trigger nine times? [¶] Now, Omar had to take many steps in order to reach the desired outcome in order to kill [Calvillo]." The prosecutor then detailed, at some length, each action leading to the murder. She also referenced the firearms examiner's testimony that the gun had safety features that had to be disengaged, and the trigger required considerable pressure to fire. After listing these "steps," she continued, "deliberation and premeditation often go hand in hand. When you think about killing somebody, you decide you're going to kill them before you actually shoot them. In this case, Omar thought about killing [Calvillo], thought about all of the steps he would have to take in order to do so, went through all of those steps because he formed the decision to kill him before he did. That killing was premeditated."

The cited portions of the prosecutor's argument did not impermissibly conflate the concepts of intent and premeditation. The gist of the argument was that, because Omar had to engage in a sequence of steps to commit the shooting, he had thought about his actions and made a considered decision to kill. Jurors

would not have gathered, from the cited statements, that mere intent to kill was the equivalent of premeditation and deliberation. We " ' "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]' " (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 894.) Because the argument was not objectionable, defense counsels' performance was not objectively unreasonable. "Failure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

Nor are we convinced by appellants' argument that the prosecutor improperly argued the fact Omar fired multiple rounds was sufficient, by itself, to prove premeditation and deliberation. For one thing, the number and manner of shots fired is relevant to the question of premeditation. (See *People v. Son* (2020) 56 Cal.App.5th 689, 692 ["There certainly are cases where the number of shots fired can indicate premeditation, but not always"]; *People v. Francisco*, *supra*, 22 Cal.App.4th at p. 1192.) For another, the prosecutor did not state or imply that the number of shots, by itself, was sufficient to prove premeditation. No misstatement of the law is apparent.

d. *Text messaging illustration*

Appellants further contend that an illustration the prosecutor used in closing was misleading. In that argument, which we set forth in the margin, the prosecutor analogized premeditation to the decision to text while driving.[13] The

---

[13] The prosecutor argued as follows: "To give you an example of an act that is intentional, premeditated, deliberate, we'll take for example, texting while driving. When you text while on the road, it's an act that you do intentionally. It's something that you

45

do on purpose. . . . . Not only is it an intentional act, it's also a premeditated act, meaning you decide to do it before you actually do it. That's all that means. You pick up your phone because you decide you're going to text while you're driving. So the fact that you pick up your cellphone to [send] a text message while you're on the road means that act was premeditated. You decided you were going to do it before actually doing the act of texting. Now, whether it's deliberate or not. Now, the defense has kind of described a deliberate act as something that requires extensive consideration and that simply is not the case. You do have to consider the action that you're about to take and what may be involved. So say, for instance, when you're driving, and you think about texting with your cellphone, you know that texting while driving is likely dangerous. It's likely against the law, and you know that if you get caught by a police officer, you'll likely get pulled over. We know all of these things and your mind processes these thoughts very quickly. I mean, in less than a second, you can form the thought. You see your phone[,] you see it light up, you grab it, and you want to [send] a text. This happens within seconds. Where you intend to send a text message, you decide you're going to send it, and you deliberate about, am I going to send it? Knowing the fact that it could be dangerous while driving. It could cause you to get a ticket if an officer were to see you. But our minds process many thoughts in very short amounts of time. We're able to do these things very quickly, sometimes even simultaneously. So it doesn't require what might be described as in Lord of the Rings there's a character called . . . Gollum. How he sits at the pond and he's talking to himself and he says, oh, I want to get the ring, and then another side says, no. You can't but he's your friend and then the other side says, oh, but I still want—that's not what we're talking about here, ladies and gentlemen. It doesn't require you to make a—as the defense described—a mental list of every single consequence that can come from your action and think of what may be affected and their families and who their families may be. That is not what

46

argument was aimed at showing that the process of premeditation and deliberation did not need to be lengthy or extensive.

Much of the information conveyed in the prosecutor's remarks was accurate. Premeditation and deliberation can occur rapidly. (*People v. Salazar*, *supra*, 63 Cal.4th at p. 245; *People v. Potts*, *supra*, 6 Cal.5th at p. 1027.) The type of "extensive consideration" and "mental list" the prosecutor referenced are, as she argued, not required. (See § 189.) The text message analogy resembled, to some extent, an illustration found permissible in *People v. Avila* (2009) 46 Cal.4th 680. There, the prosecutor "used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' [The prosecutor] then immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " (*Id.* at p. 715; see also *People v. Son*, *supra*, 56 Cal.App.5th at pp. 692, 698–699 [yellow light analogy to illustrate premeditation and deliberation was not improper].)

Similarly, here, the prosecutor's point was that when considering whether to text and drive, one must evaluate a variety of factors, such as safety and the potential consequences.

---

the law requires. So that, in fact, is a very simple example of an intentional premeditated and deliberate act that people do . . . ."

47

Unlike in *Avila*, the prosecutor did not include a disclaimer that the consequences of texting and driving were less dire than the choice to commit a murder; however, this difference is insignificant, given that it would have been obvious to jurors. Arguably, the prosecutor gave a less detailed discussion of the hypothetical texter's decision-making process. But, the prosecutor acknowledged that, "You do have to consider the action that you're about to take and what may be involved." She did not argue that appellants premeditated in a split second. And, she voiced her agreement with defense counsel's statement that the test is the extent of the reflection, not the time, and a decision to kill made impulsively or without careful consideration is not premeditated and deliberate. Considering the argument in context, we cannot say that the prosecutor's illustration amounted to a deceptive or reprehensible method, or infected the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process.

To the extent the texting illustration was not a model analogy in some respects, any misstep was harmless. There is no reasonable probability that, had the challenged remarks been excluded, a more favorable result for appellants would have resulted. The jury was properly instructed on premeditation and deliberation. " 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]' " (*People v. Centeno*, *supra*, 60 Cal.4th at p. 676.) The jury was instructed that the arguments of counsel were not evidence, that

48

it had to follow the law as the court explained it, and that if the attorneys' comments on the law conflicted with the court's instructions, it had to follow the instructions.  The prosecutor reiterated these points during her closing, stating:  "please refer to the jury instructions, not an attorney's characterization of them because the law is in the jury instructions."  Although appellants attempt to attribute the jury's questions, discussed *ante*, to the prosecutor's argument, we see no link.  In sum, there is no reasonable probability that, had the text messaging analogy been excluded, the result of the proceeding would have been different.

      6. *Cumulative error*

      Appellants assert that the cumulative effect of the purported errors requires reversal, even if they were individually harmless.  As we have " 'either rejected on the merits defendant[s'] claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235–1236.)

**DISPOSITION**

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



LAVIN, J.



DHANIDINA, J.